UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1639-GW-SKx | Date | October 29, 2020 |
|---|---|---|---|
| Title | *Sergio V. Bernal v. Serco, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| Jonathan Melmed | Neal A. Fisher, Jr. | |

**PROCEEDINGS:** TELEPHONIC HEARING ON PLAINTIFF'S MOTION FOR ORDER REMANDING ACTION TO STATE COURT [17]; AND SCHEDULING CONFERENCE

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Plaintiff's Motion is TAKEN UNDER SUBMISSION. Court to issue ruling by November 5, 2020.

The scheduling conference is taken off-calendar to be reset if necessary.

|  | : | 15 |
|---|---|---|
|  | Initials of Preparer | JG |

<u>*Sergio Bernal v. Serco, Inc. et al*</u>; Case No. 2:20-cv-01639-GW-(SKx)
Tentative Ruling on Motion to Remand

**I.    Background[1]**

At issue here in this wage-and-hour lawsuit is whether the Defendant has carried its burden of demonstrating that the $5 million amount-in-controversy requirement of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), has been met. Before the Court is the Plaintiff's motion to remand this case back to state court, arguing that the Defendant has not made this showing.

   A.  <u>The complaint</u>

Plaintiff Sergio Bernal worked as a parking enforcement officer for Defendant Serco, Inc. in Santa Ana, California. He filed a putative class action in state court on behalf of himself and other similarly-situated non-exempt employees who worked for Serco. The complaint alleges the following violations of California's wage-and-hour laws concerning Serco's non-exempt employees:

1. Serco failed to either: (1) provide employees with duty-free rest periods of at least 10 minutes for every four hours of work; or (2) pay them one hour's worth of wages when it could not provide the required rest period. Compl. ¶¶ 23, 26.
2. Serco failed to: (1) provide employees with a 30 minute meal period within the first five hours of their shifts or a second meal period on days where they worked more than 10 hours; or (2) pay a meal period premium for each day where Serco did not provide a compliant meal period. *Id.* ¶¶ 28-29.
   a. Serco automatically deducted 30 minutes from the employees' hours-worked figures on the assumption that they always had a compliant meal period. *Id.* ¶ 32.
3. Serco failed to pay the mandatory minimum wage premiums to employees when they had to work split shifts. *Id.* ¶ 33.[2]

---

[1] The following abbreviations are used for the filings: (1) Notice of Removal ("NoR"), ECF No. 1; (2) Declaration of Laurie Schull ("Schull Decl."), ECF No. 5; (3) Complaint ("Compl."), ECF No. 6-1; (4) Plaintiff's Motion to Remand ("Mot."), ECF No. 17; (5) Plaintiff's Evidentiary Objections ("Bernal Evid. Objs."), ECF No. 18; (6) Defendant's Opposition to the Motion to Remand ("Opp."), ECF No. 20.

[2] A split shift is a work schedule that is split into two or more parts by something other than a rest or meal period. For example, a work schedule that has a shift from 6am to 10am in the morning followed by a 3pm to 7pm shift in the afternoon/evening is a split shift.

1

    4. Serco did not reimburse employees for all expenses they necessarily incurred as a direct consequence of their job responsibilities. Here, Serco required employees to use their personal cell phones for work purposes, such as calling into an automated system to clock in and out of their shifts, or to communicate with their supervisors. *Id.* ¶ 38.

    5. As a result of the violations alleged above, Serco failed to:

        a. Provide accurate wage statements to PEOs. *Id.* ¶ 40.

        b. Maintain accurate records of hours worked by PEOs . *Id.* ¶ 45.

        c. Timely pay all earned, unpaid wages to PEOs. *Id.* ¶¶ 47, 49.

In addition to these violations, the complaint also states a claim for penalties under California's Private Attorneys General Act ("PAGA") based on these alleged violations.

    B.  <u>Procedural history</u>

    Bernal filed this putative class action against Serco in Orange County Superior Court in July 2020. *See* Compl. Serco removed the case to federal court, arguing that this case fits under CAFA, which gives district courts original jurisdiction over a class action if: (1) it involves 100 or more putative class members; (2) there is minimal diversity; and (3) the amount in controversy exceeds $5 million. *See* NoR; 28 U.S.C. § 1332(d).

    Bernal filed this motion to remand. He does not dispute that the first two requirements are satisfied. His sole argument is that the amount-in-controversy requirement has not been met.

**II.**    **Legal Standard**

    Federal courts operate under the presumption that they do not have jurisdiction over state-law causes of action. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The party seeking removal has the burden of showing that the federal court has jurisdiction over the matter and that removal is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Although courts generally "strictly construe the removal statute against removal jurisdiction," *Gaus*, 980 F.2d at 566, and "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," *id*. (citing *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979)), there is no anti-removal presumption in cases invoking CAFA. *See Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554, 190 L. Ed. 2d 495 (2014). Nevertheless, "[t]he party seeking the federal forum [in CAFA cases still] bears the burden of establishing that the statutory requirements of federal jurisdiction have been met," *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 978 (9th Cir. 2013), and, "if the evidence submitted

by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1199 (9th Cir. 2015).

Where a complaint does not allege a specific amount in damages, the removing defendant bears the burden of proving by a preponderance of the evidence that the amount in controversy exceeds the statutory minimum. *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1996); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (observing that the "defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds that amount").

A court "cannot base [its] jurisdiction on a [d]efendant's speculation and conjecture." *Lowdermilk v. United States Bank Nat'l Ass'n*, 479 F.3d 994, 1002 (9th Cir. 2007). The defendant must "prov[e] the facts to support jurisdiction, including the jurisdictional amount." *Gaus*, 980 F.2d at 567. In addition to the contents of the removal petition, the court considers "summary-judgment-type evidence relevant to the amount in controversy at the time of removal," such as affidavits or declarations. *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (internal quotations omitted); *Singer*, 116 F.3d at 374 ("defense counsel submitted declarations to show that the amount in controversy exceeded $50,000"). A court may also consider supplemental evidence later proffered by the removing defendant, which was not originally included in the removal notice. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n. 1 (9th Cir. 2002).

### III. Discussion

#### A. The proposed class

Part of the difficulty in estimating the amount in controversy herein stems from the fact that the complaint contains so few factual allegations. For starters, it is not even clear what kind of company Serco is. The only direct information the complaint provides is that it is a New Jersey corporation that does business in Orange County, California. Compl. ¶ 15. The complaint indicates that Serco has employees who work as parking enforcement officers ("PEOs"), such as Bernal. It appears PEOs would, in conjunction with sweepers, monitor paid parking lots and issue parking tickets to vehicles without permits. *Id.* ¶ 37.

The lack of information about Serco makes Bernal's proposed class difficult to identify. Does "all individuals who are or were employed as hourly, non-exempt employees" refer to just PEOs, or is it broader than that? *See id.* ¶ 1. Does it include other Serco employees manning

parking lots, such as sweepers? Does Serco have hourly, non-exempt employees in other areas of operations that are intended to be part of the class? The complaint does not say.

For the purposes of this motion, the Court assumes that the proposed class consists of just PEOs. The complaint refers to the lawsuit as a civil action "on behalf of [Bernal] and all other current and former *similarly situated* employees employed by Defendant Serco. [Emphasis added.]" *Id.* Given that the complaint alleges "[Bernal], the Class Members, and the Aggrieved Employees were also required to take photos of ticketed vehicles with their personal cell phones on occasions when the handheld ticketing machine was not working," it appears Bernal intended the proposed class to refer to just PEOs. *Id.* ¶ 37.

This definition is important because it makes a big difference in the amount-in-controversy calculation. In its opposition to this motion to remand, Serco provided a set of calculations based on a class definition that included all hourly, non-exempt employees from diverse areas of operations such as shipbuilding and air traffic control. Opp. at 12. This would have included an additional 1,123 employees on top of the 360 PEOs that have been identified. *Id.*

Accordingly, the Court will consider only Serco's analysis of the claims of the 360 PEOs. This is the analysis Serco provided when it first removed the case to this Court. *See* NoR.

B. Serco's estimate of the amount in controversy

Serco estimates the amount-in-controversy to be roughly $7.8 million, which is not so much greater than the $5 million threshold that the Court can be comfortably assured that the jurisdictional amount is actually satisfied here. NoR ¶ 68. Serco's estimate involved looking at its payroll records to examine the logs of shifts worked by the proposed class members during the relevant time periods. The precise breakdown is shown below:

- Unpaid Overtime Wages: $849,479
- Unpaid Rest Period Premiums: $1,409,062
- Unpaid Meal Period Premiums: $1,327,967
- Wage Statement Penalties: $280,050
- Waiting Time Penalties: $685,248
- Failure to Timely Pay Wages: $1,656,200
- Reimbursed Businesses Expenses: $36,486
- Attorney Fees: $1,561,123

4

Added together, the estimated amount is $7,805,615. *Id.*

### C. The parties' dispute over the proper estimate of the amount in controversy

#### i. *Bernal's evidentiary challenges*

As an initial matter, Bernal challenges Serco's evidence in support of its estimate of the amount in controversy. *See* Bernal Evid. Objs. That evidence consisted of a declaration by one of Serco's Senior Payroll Managers, Laurie Schull. *See* Schull Decl. Schull analyzed the time records and pay data maintained by Serco to estimate the wages owed to the proposed class under their theories of liability. Bernal blanketly challenges these factual assertions, such as the number of work shifts involved or the $17.20 average hourly pay figure Schull arrived at as lacking foundation or calling for speculation. However, in determining whether the amount in controversy is met, courts consider "summary-judgment-type evidence relevant to the amount in controversy at the time of removal," such as affidavits or declarations. *Valdez*, 372 F.3d at 1117; *Singer*, 116 F.3d at 374 ("defense counsel submitted declarations to show that the amount in controversy exceeded $50,000"). Schull's declaration is precisely the kind of evidence that other courts have considered. Bernal's objections are overruled.

#### ii. *The violation rate*

Serco's calculations all assume that there was a 100% violation rate. For example, it assumes that Serco never provided PEOs with a compliant rest or meal period. In wage-and-hour cases such as this one, "violation rates are key to the calculations necessary to reach the [$5 million] amount-in-controversy figure CAFA requires." *Toribio v. ITT Aerospace Controls LLC*, No. 19-cv-05430-GW, 2019 WL 4254935, at *2 (C.D. Cal. Sept. 5, 2019). A defendant attempting to establish an amount in controversy by a preponderance of the evidence may do so by assuming the frequencies of violations, but those assumptions must be reasonable. *See Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1993, 1199 (9th Cir. 2015).

In determining the reasonableness of an assumed violation rate, "the Ninth Circuit distinguishes between complaints of 'uniform' violations and those alleging a 'pattern and practice' of labor law violations." *Dobbs v. Wood Grp. PSN, Inc.*, 201 F. Supp. 3d 1184, 1188 (E.D. Cal. 2016) (citing *La Cross v. Knight Trans. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015)). When a complaint alleges "uniform" violations, it might be reasonable to assume a 100% violation rate if "the plaintiff offers no competent evidence in rebuttal." *Dobbs*, 201 F. Supp. 3d at 1188. But when a complaint alleges a "pattern and practice" of labor law violations, a 100%

5

violation rate is unreasonable; the assumed violation rate must be lower. *See id.*; *Ibarra*, 775 F.3d at 1198-99 ("[A] 'pattern and practice' of doing something does not necessarily mean always doing something." (emphasis in original)).

The allegations do not appear to the Court to rise to the level of "uniform" violations, in part because they are vague and sometimes contradictory. For example, the complaint alleges that "[d]ue to the demands of the job, [employees] were not authorized or permitted to take ten-minute off-duty rest periods." Compl. ¶ 23. This sounds like Serco's official policy expressly prohibited POEs from ever taking rest periods, which would mean a 100% violation rate. However, in the very next sentence, the complaint alleges that "[e]ven when they were permitted to take ten minute timely rest periods, they were not provided with off-duty rest periods as they were required to remain on-duty and charged with various tasks during their rest periods." *Id.* This allegation backtracks the 100% prohibition. But then in cases where rest periods were permitted, how many of the rest periods were actually burdened with duties such that the time was still compensable under California law? Again, the complaint offers no evidence to suggest what the frequency is.

The allegations fit better under the "pattern and practice" and "pattern and policy" categories of allegations, where numerous courts have found violation rates between 25% and 60% are reasonable. *See Castillo v. Trinity Servs. Grp., Inc.*, No. 19-cv-01013-DAD, 2020 WL 3819415, at *7 (E.D. Cal. July 8, 2020) (citing cases); *see, e.g.*, Elizarraz v. United Rentals, Inc., No. 18-cv-09533-ODW, 2019 WL 1553664, at *3-4 (finding a 50% violation rate for missed meal periods and a 25% violation rate for missed rest periods reasonable based on "pattern and practice" allegations); *Oda v. Gucci Am., Inc.*, No. 2:14-cv-07468-SVW, 2015 WL 93335, at *5 (C.D. Cal. Jan. 7, 2015) (finding a 50% violation rate reasonable based on "pattern and practice" allegations); *see also Zamora v. Penske Truck Leasing Co., L.P.*, 20-cv-02503-ODW, 2020 WL 4748460, at *5 (C.D. Cal. Aug. 17 2020) (finding that 10% violation rate was reasonable).

To meet the $5,000,000 amount here requires a violation rate of at least 64%.[3]

---

[3] This is an approximation. A 100% violation rate results in an estimate of $7.8 million when Serco's methods are used. Some of the figures contributing to the $7.8 million sum are not proportional to the violation rate. For example, a failure to timely pay final wages results in a penalty when there is at least one instance of a rest- or meal-period violation – but it does not depend on exactly how many there were. However, because the largest amounts that contributed to the $7.8 million figure – such as the overtime wages, meal premiums, and minimum wage claims – are all proportional to the violation rate, this means a $5 million figure should roughly correspond to a 64% violation rate.

### iii. *Whether Serco has met its burden here*

The Court does not find that Serco has demonstrated that a 64% violation rate is appropriate, and therefore finds that Serco has not met its burden of demonstrating the amount-in-controversy has been met.  First, the 64% is already on the high end of the violation rates used by courts.  Given the lack of factual allegations to offer any evidence of the frequency of the violations, the Court sees no reason why a violation rate on the very high end is appropriate.

The Court is also uncertain about some of the underlying damages claims, such as the $849,479 overtime pay figure.  NoR ¶ 30.  This stems from Bernal's allegation that Serco "violated Labor Code § 512 by failing to provide [employees] 30 minute uninterrupted meal periods within the first five hours of the employee's shift or a second meal period on days when they worked more than 10 hours."  Compl. ¶ 28.  According to Bernal, Serco "automatically deducted a half hour from [employees'] wages as though they had taken a full 30-minute off-duty meal period, even when they did not."  *Id.* ¶ 32.

Serco arrived at the $849,479 figure as follows.  It observes that during the relevant time period "PEOs have worked at least 77,226 shifts eligible for meal periods (i.e. shifts longer than 5 hours).  It calculated the overtime pay Serco allegedly owes by: "(1) adding 30 minutes to each meal-period eligible shift; and (2) applying the average PEO overtime pay rate of $25.80 to *all minutes that exceeded eight hours* on these shifts after adding 30 minutes of time to those shifts."  Schull Decl. ¶ 6 (emphasis added).[4]

This seems problematic.  Suppose a PEO was recorded in Serco's database as having worked a 10-hour shift.  Serco would have then paid him a total of $189.20: $17.80 * 8 + $25.80 * 2 ($17.80 is the regular hourly rate).  Critically, Serco would have already compensated the PEO for 2 hours of overtime pay, *i.e.*, $51.60.  However, following the outlined steps, Serco adds 30 minutes to the 10-hour shift, and then "appl[ies] the average PEO overtime pay rate of $25.80" to 2.5 hours, for a total of $64.50.  Serco's $849,479 would appear to include *all* of the $64.50, even though Serco has already paid $51.60 of it to the PEO and would, if found liable, owe only an additional $12.90.

---

[4] Bernal argues that he is not seeking overtime wages.  *See* Mot. at 5.  However, his allegations clearly suggest that overtime wages may be owed as required by law, and his attempt to disclaim any overtime pay is clearly an attempt to avoid federal court.  He cites to no authorities suggesting that a court may ignore such claims in determining whether an amount-in-controversy requirement is met, though it does not matter here as the Court concludes that even if this is included, the requirement has not been met.

7

8

Given these uncertainties, the Court finds that Serco has not adequately demonstrated that the amount-in-controversy requirement has been met.

## IV. Conclusion

Based on the foregoing discussion, the Court **GRANTS** the motion to remand this case to state court.

8